UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAETANO CAMPOBASSO,

Plaintiff,

v.

JO ANNE BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

No. 04 C 8057
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Gaetano Campobasso is a former candy factory worker who began experiencing back pain after a fall at work. He applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in June 2001, alleging that he became disabled in October 1988. His claim was denied initially and on reconsideration, and was then reviewed by an Administrative Law Judge (ALJ). The ALJ issued a partially favorable decision on March 25, 2003, finding Campobasso disabled as of June 28, 2001 (the date of his application for benefits), which made him eligible for SSI but not DIB. The Appeals Council denied Campobasso's Request for Review on October 29, 2004, rendering the ALJ's decision the final decision of the Commissioner.

At his hearing before the ALJ, Campobasso testified that he worked from the time he finished high school until October 1988. His last job was stacking thirty-pound boxes of candy on pallets at a candy factory. He stopped working because of lower back pain.[1] Thereafter he

---

[1] Campobasso testified that he received workers' compensation for six months and then applied for disability in 1988 or 1989, but was denied.

experienced pain in his lower back that affected the muscles in his back and torso. Because of this pain he could only sit or stand for 30 to 45 minutes at a time; he could lift only five pounds; he could sleep four to five hours at a time but would wake with back pain; he consumed between 10 and 16 ibuprofen each day to ameliorate his pain; and he would lie down one to two hours daily due to back pain. He also indicated that his pain was worse at the time of the hearing than in 1989.

Campobasso also testified that he experienced sciatica in his right leg that prevented him from walking, lifting or standing on his leg during flare-ups. He stated that the sciatica would occur approximately once every two months, sometimes as frequently as twice each month, and that the flare ups would last for a few days at a time. Campobasso also discussed his asthma, tachycardia, and problems with his neck that prevent him from moving it in any direction due to calcification. He testified that he was dissatisfied with a brief course of treatment with a chiropractor.

When questioned about his current condition, Campobasso testified that he lived with his girlfriend and her mother. Although he was able to drive occasionally, his girlfriend had driven him to the hearing that day. He testified that he cooked three to four times per week and went grocery shopping with his girlfriend, but could carry only light bags. Campobasso had gone to a movie theater recently but was unable to sit through the movie. With respect to financial support, he testified that his father left him money after he retired and that his brother and sister supported him.

*Medical Evidence Prior to December 31, 1994[2]*

A September 1988 x-ray of Campobasso's back confirmed first-degree (grade I) spondylolisthesis, a condition involving misalignment of the spinal vertebrae. The physician who diagnosed Campobasso's condition also noted bilateral spondylosis (a degenerative disease of the spine) and mild scoliosis. In December 1988, Campobasso was admitted to the hospital complaining of back pain. He was again diagnosed with spondylolisthesis and received a steroid injection; he was discharged after three days, complaining of continued back pain.

In January 1989, Dr. Henry Goldstein examined Campobasso, who complained of increasing pain and lower back stiffness. Dr. Goldstein reported diffused tenderness of the back, flexion at 45 degrees and extension at 15 degrees. Dr. Goldstein opined that Campobasso was "permanently disabled" from pain resulting from spondylolisthesis. (R. at 126.) On February 28 and March 3, 1989, Campobasso had x-rays and a pyelogram performed on his kidneys. Dr. David Ying concluded that the test results were consistent with "marked focal atrophic changes" of the kidney, "most likely due to chronic infection." (R. at 132-33.)

In October 1992, Dr. Girard treated Campobasso for asthma and in December 1992, he treated Campobasso for diarrhea, nausea and colitis. Dr. Girard noted that Campobasso was having seven to eight stools per day. In March 1993, Dr. Jobski performed a stress test on Campobasso after he complained of palpitations and atypical chest discomfort.

From February through June 1993, Campobasso underwent chiropractic treatment for complaints of pain radiating across his entire back. Campobasso told the chiropractor that the

---

[2]December 31, 1994 was the date by which Campobasso was required to establish disability in order to be eligible for disability insurance benefits.

pain began five years earlier. The chiropractor noted that x-rays showed multiple levels of vertebral displacement and grade I spondylolisthesis. He also found bilateral sacroiliac joint narrowing with sclerosis that was likely related to bowel syndrome. He recommended manipulation, electrical muscle stimulation, and hot moist packs for six weeks.[3]

*Medical Evidence After 1994*

In August 2001, Campobasso was examined by Dr. Michael Raymond. At that time, Campobasso complained of back pain, colitis, fast heartbeat, and asthma. Dr. Raymond noted that Campobasso had been diagnosed with ulcerative colitis in 1978 and reported experiencing six bowel movements a day with abdominal pain after eating fried foods. Campobasso complained to Dr. Raymond of a "fast heartbeat" for the previous three years, but with medication he had not experienced any episodes of superventricular tachycardia. Campobasso indicated that he suffered from asthma since 1979 and used his inhaler twice a day, but was "for the most part comfortable and able to carry out on his activities of daily living." (R. at 158.) On examination of the neck, lungs, heart, and abdomen, Dr. Raymond reported no significant abnormalities. Dr. Raymond did report restricted range of motion of the back and neck. August 2001 X-rays of the lower back showed grade three to grade four spondylolisthesis with marked narrowing and degenerative changes. Further x-rays of Campobasso's neck in November 2001 showed mild, multi-level disc space narrowing.

---

[3]The chiropractor's progress notes indicate: Campobasso felt "great" on March 3; his mid to lower back felt better on March 20; on March 27 his back and chest pain had been prevalent for a week; in April he was able to go to the zoo for a day; and on June 1 his neck pain was worse and that his neck tired easily.

4

Campobasso was examined again in December 2002 by an orthopedic surgeon, Dr. James Elmes. Dr. Elmes concluded that Campobasso could lift less than ten pounds, stand or walk less than two hours in an eight-hour workday, periodically alternating between sitting and standing, and that he had postural, manipulative and environmental limitations.

*Testimony of the Vocational Expert*

Vocational expert Frank Mendrick testified at Campobasso's administrative hearing. The ALJ asked Mendrick to consider a hypothetical individual with Campobasso's vocational profile (unskilled labor) who, due to back and neck problems, could perform work that entailed sitting or standing for up to 45 minutes, lifting 10 pounds frequently and 20 pounds occasionally, but could not climb, crawl, squat or kneel or engage in repetitive bending, twisting or turning. Mendrick testified that the individual could not perform Campobasso's past work, but could perform sedentary work such as an assembly worker, an inspector, or a cashier. On cross-examination, Mendrick testified that if the hypothetical individual had to lie down for an hour a day, not on-schedule but due to pain or fatigue, the individual would be precluded from all work. Mendrick further testified that a claimant would be precluded from all work if he experienced significantly limited range of motion of the head.

*Decision of the Administrative Law Judge*

The ALJ found evidence to support Campobasso's claim of disability as of the date Campobasso filed his claim (June 28, 2001), but not prior to that date. He observed that while 1988 x-rays revealed grade I spondylolisthesis with bilateral spondylosis, medical evidence demonstrated little change 10 years later. Chiropractic records from 1993 also refer to grade I spondylolisthesis. Relying on this characterization, the ALJ found that from October 1988 to

December 31, 1994, Campobasso's medically determinable impairments precluded the following work-related activities: lifting more than 10 pounds, repetitive bending, twisting and turning; climbing, crawling, squatting and kneeling; repetitive pushing, pulling, gripping or grasping; working around dangerous machinery or unprotected heights; and sitting or standing for more than 45 minutes without the option of changing position. The ALJ stated that Campobasso's failure to seek treatment for such a long period, his use of ibuprofen and his ability to sit and stand approximately 45 minutes at a time undermined Dr. Goldstein's opinion that Campobasso was permanently disabled in 1989. The ALJ also concluded that Campobasso's ulcerative colitis did not cause him pain often, that his asthma was well-controlled and that he had not suffered an episode of superventricular tachycardia in roughly three years.

With regard to Campobasso's residual functional capacity, the ALJ concluded that Campobasso could not perform any past relevant work, had limited education and no transferrable skills. He determined that between October 6, 1988 and December 31, 1994, Campobasso was capable of a limited range of sedentary work and that there were a significant number of jobs in the regional economy that Campobasso could have performed prior to December 31, 1994. However, he noted that as of August 2001, Campobasso's spondylolisthesis had progressed to grade III/IV, with marked narrowing and degenerative change at the L5/S1 disc space. Moreover, Campobasso's range of motion was limited in the lumbar spine and was severely limited in the cervical spine. The ALJ concluded that by the date Campobasso filed his claim, his residual functional capacity included limitations that significantly eroded the sedentary occupational base identified by the vocational expert, and ruled Campobasso disabled as of June 28, 2001.

*Standard of Review*

In reviewing the final decision of the Commissioner, I must accept as conclusive the findings of fact made by the ALJ if they are supported by substantial evidence. 42 U.S.C. § 405(g). "Although a mere scintilla of proof will not suffice to uphold the [Commissioner's] findings, the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the record contains such support, I must affirm the decision of the Commissioner unless she made an error of law. *Veal v. Bowen*, 833 F.2d 693, 696 (7th Cir. 1987). I may not re-weigh the evidence, re-evaluate the facts or substitute my own judgment in determining whether a claimant is or is not disabled. *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Nor may I reconsider the ALJ's credibility determinations. *Prince v. Sullivan*, 933 F.2d 598, 601-02 (7th Cir. 1991).

*Plaintiff's Objections to the Commissioner's Ruling*

Campobasso argues that five aspects of the ALJ's decision were erroneous and require reversal. These include: 1) the ALJ's failure to call an expert to help determine the onset date of Campobasso's disability; 2) the ALJ's determination of Campobasso's residual functional capacity; 3) the hypothetical questions posed by the ALJ to the vocational expert; 4) the ALJ's credibility determination and pain analysis; and 5) the ALJ's review of Campobasso's full range of impairments. I address each of these claims in turn.

*Onset Date*

Campobasso objects first to the manner in which the ALJ determined the onset date of his disability, a date that fell after the expiration of Campobasso's insured status and rendered him

7

ineligible for DIB. Social Security Ruling 83-20 ("SSR 83-20") establishes that the starting point for determining an onset date is the claimant's alleged onset date. *See Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991) (citing SSR 83-20). The ALJ may adjust that date by considering the claimant's work history and may further adjust the date after reviewing medical reports describing examinations or treatment of the claimant. *Id.* Because medical evidence establishing the precise onset date of disabilities of non-traumatic origin is often unavailable, the onset date must be established through resort to inferences based on evidence before the ALJ. *Id.* When a claimant's medical chronology is incomplete, the ALJ "should consult a medical advisor to make th[ese] inference[s]." *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999).

In this case, the starting point for determining onset is October 1988. The ALJ did not begin here, and his analysis of the onset date does not follow the SSR 83-20 procedure. Although he did consider some of the evidence relevant to the SSR 83-20 analysis (*e.g.*, he considered medical evidence from physicians treating Campobasso), his identification of a June 2001 onset date – the date Campobasso filed for disability – is not supported by any medical evidence.

In his findings, the ALJ concluded that between October 1988 and December 1994 Campobasso suffered from medically determinable impairments that precluded certain, but not all, work-related activities. However, Campobasso's spondylolisthesis had progressed to grade III/IV by August 2001, and a 2002 x-ray revealed cervical spine disease with multi-level disc space narrowing and torticollis, and limited range of motion in the cervical spine. Clearly, at some time between the alleged 1988 onset date and August 2001, Plaintiff's condition evolved into one that prohibited work-related activity. The ALJ pin-pointed this date as June 28, 2001.

8

This was an arbitrary selection, not supported by any evidence. *Cf. Rohan v. Barnhart*, 306 F. Supp. 2d 756, 768 (N.D. Ill. 2004) (finding that it was error to base the onset date solely on the diagnosis date).

For these reasons, I find that the ALJ's determination of the onset date was not based on a proper analysis of the evidence before him. Moreover, the testimony of a medical expert would have allowed the ALJ to establish an onset date consistent with the evidence (including the notes of Campobasso's chiropractor in early to mid-1993). Although the medical record is complete to the extent that it reflects Campobasso's medical history, *see Henderson*, 179 F.3d at 513, the long gaps between Campobasso's various treatments suggest that a medical expert's opinion would be useful in "completing" the onset determination. Therefore, I remand the case to the ALJ for a determination of the onset date consistent with the procedure outlined in SSR 83-20, the medical evidence in this case, and the evaluation of a medical expert. Whether that evidence will establish the onset of Campobasso's disability at a time prior to the expiration of his insured status remains to be seen.

*Residual Functional Capacity*

Campobasso next challenges the ALJ's residual functional capacity (RFC) assessment. First, citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), he argues that the ALJ, who limited Campobasso from any repetitive bending, did not fully accommodate his bending limitation when failing to address the *degree* to which he could bend. Campobasso's reliance on *Golembiewski* is misplaced. In that decision, the Court of Appeals for the Seventh Circuit found that the ALJ's failure to discuss the claimant's limited ability to bend meant that an entire line of evidence was ignored. *Id.* That error had particular significance because the ALJ

limited the claimant to light work that required occasional bending at the waist. In this case, the ALJ did not ignore an entire line of evidence. The fact that he considered medical evidence showing that Campobasso was limited in his ability to bend is evidenced by his limitations, which included no repetitive bending, twisting, and turning. While Campobasso draws a relevant distinction between the ability to bend repetitively and the ability to bend beyond a certain point just once, the distinction is insufficient to overturn the ALJ's assessment.[4] The ALJ properly considered the evidence and accommodated Campobasso's limitation.

Campobasso's next challenge to the RFC assessment, that the ALJ improperly found that he could sit or stand for 45 minutes at a time, is without merit. Campobasso's own testimony was that he could sit or stand between 30 to 45 minutes. Finally, Campobasso objects to the ALJ's failure to discuss his need to lie down for up to two hours during each day (between 1990 and 1992) as part of the RFC assessment. The ALJ's statement that the assessment "takes into account claimant's own assessment of his limitations during that time with the exception of his assertions concerning his lifting capability (5 pounds)," (R. at 20), reveals that he did fail to consider this limitation. On remand the ALJ should consider this testimony, giving it whatever weight he deems appropriate in light of his assessment of Campobasso's credibility.

*Hypothetical Question posed to the Vocational Expert*

Campobasso next challenges the hypothetical question the ALJ posed to the vocational expert, arguing that it failed to include all of the relevant limitations, including the degree to which he could bend, his limited range of neck motion, and his need to lie down for up to two hours during the day.

---

[4] That assessment led to the vocational expert's conclusion that Campobasso could perform sedentary work prior to December 1994.

10

> Ordinarily, a hypothetical question to the vocational expert must
> include all limitations supported by medical evidence in the record
> . . . It is important for the vocational expert to understand the full
> extent of the applicant's disability so that the expert does not
> declare the applicant capable of undertaking work in the national or
> local economy that the applicant cannot truly perform.

*Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). The ALJ's RFC assessment included a limitation against working around dangerous machinery or unprotected heights; yet he failed to include this limitation in the hypothetical posed to the vocational expert. The Commissioner suggests that the sedentary jobs identified by the expert in response to the hypothetical generally exclude jobs involving unusual hazards, and while this may be true, there is no evidence in the record to support that conclusion with respect to this plaintiff in this market. On remand, this limitation should be included within a revised hypothetical posed to a vocational expert.

Moreover, if on remand, the ALJ finds credible Campobasso's claimed limitation of needing to lie down during each day, that finding would need to be incorporated into the hypothetical question. As explained above, I believe the ALJ sufficiently considered the limitation of Campobasso's ability to bend. Finally, Campobasso's claim of limited range of neck motion is not sufficiently supported by medical evidence in the record. The ALJ's failure to include it within the hypothetical question was not erroneous.[5]

*The ALJ's Adverse Credibility Finding*

In 1989, a physician examined Campobasso and declared him permanently disabled. The ALJ rejected this conclusion, finding that the objective medical evidence did not support the

---

[5] Campobasso testified that although his neck pain had existed for ten years, the pain began as a "little" pain in his neck, becoming progressively worse, and that he only experienced difficulty turning his neck or looking up and down "about a couple years later." (R. at 242.)

physician's disability determination. He also rejected Campobasso's assessment of disabling pain. Campobasso contends that the ALJ's credibility determination was flawed and was used improperly to reject the physician's disability assessment.

When an ALJ denies benefits he must build an "accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Moreover, an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). The ALJ's finding of credibility is entitled to special deference, *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000), and should not be disturbed unless patently wrong. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). *See also Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) ("[w]e will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong") (citations omitted).

> [When] medical evidence supports the claimant's allegations and the ALJ nevertheless rejects a claimant's testimony as not credible, the ALJ cannot merely ignore the claimant's allegations . . . and must articulate specific reasons for his finding . . . Those reasons must be supported by record evidence and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (internal quotations and citations omitted).

The ALJ found that the following facts significantly undermined Campobasso's characterization of his pain: his failure to seek treatment for extended periods of time, his use of only over-the-counter medication, and his ability to sit or stand for up to 45 minutes at a time. Campobasso did, in fact, go for extended periods without medical treatment. While Campobasso indicated that this was due to a lack of money or insurance, he also testified that he received

12

financial assistance from his father and siblings. In light of this evidence, the ALJ did not err when he drew an adverse inference from Campobasso's failure to seek medical attention for extended periods. Moreover, the ALJ's failure to consider 10 weeks of prescription drug use during a disability alleged to have lasted more than 10 years does not require reversal of the credibility finding. The ALJ's reliance on Campobasso's own testimony (that he could sit or stand for up to 45 minutes) in assessing Campobasso's credibility was not erroneous.

There were no "serious errors" in the ALJ's reasoning. *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). His reasons for discrediting Campobasso's testimony are specific and illuminate his conclusion not to adopt Dr. Goldstein's opinion of permanent disability.[6] Moreover, the ALJ did not rely solely on any one of these facts in reaching his conclusion that Campobasso was not disabled in 1989, but on the combination of these facts and the medical evidence before him. In sum, the ALJ's decision to discount the 1989 physician diagnosis of permanent disability was supported by substantial evidence and was not erroneous as a matter of law.

*Campobasso's Claims in Combination*

Finally, Campobasso argues that once the ALJ found his back condition to be "severe," he erred in failing to consider the impact of Campobasso's other ailments in combination with his back pain in reaching the disability determination.

> Having found that one or more of [the claimant]'s impairments
> was 'severe,' the ALJ needed to consider the aggregate effect of

---

[6]The ALJ did not reject the physician's objective medical findings, *cf. Lopez*, 336 F.3d at 540 (reversing when ALJ ignored objective medical evidence), but only the physician's conclusion that Campobasso was "permanently disabled." That conclusion is not entitled to particular weight as the issue of disability is reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

> this entire constellation of ailments–including those impairments
> that in isolation are not severe.

*Golembiewski*, 322 F.3d at 918 (citing 20 C.F.R. § 404.1523) (other citations omitted).

Campobasso states that the ALJ "minimized the impact of . . . other conditions including [ ] ulcerative colitis, asthma and heart disease" when evaluating his claim. (Pl. Mem. at 14.) The evidence demonstrated that Campobasso lived and worked with the first two conditions throughout his employment, and had not suffered from the latter condition during the last three years. There is no evidence to suggest that the asthma and heart conditions, even in combination with Campobasso's "severe" back condition, would have affected the disability determination. However, there is some evidence in the record suggesting that Campobasso's colitis was related to, and may have affected, his back pain. Further, although the ALJ stated that he considered "the combination of the claimant's impairments," his opinion does not reference the diagnosis of osteopenia in Campobasso's cervical spine, evidence of a possible kidney impairment, and evidence of bilateral sacro-iliac narrowing (revealed in a 1993 x-ray) and sclerosis. The ALJ must address this evidence on remand.

For these reasons, Campobasso's Motion for Summary Judgment is Denied. The case is remanded to the Commissioner for further proceedings consistent with this ruling.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: December 20, 2005